**SUMMONS - CIVIL**
JD-CV-1   Rev. 2-25
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| For information on ADA accommodations, contact the Centralized ADA Office at 860-706-5310 or go to: www.jud.ct.gov/ADA/ | STATE OF CONNECTICUT JUDICIAL BRANCH **SUPERIOR COURT** www.jud.ct.gov |
|---|---|

**Instructions are on page 2.**

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☒ Select if claiming other relief in addition to, or in place of, money or damages.

---

**TO: Any proper officer**

By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk *(Number, street, town and zip code)* | Telephone number of clerk | Return Date *(Must be a Tuesday)* |
|---|---|---|
| 69 Brooklyn St, Vernon, CT 06066 | ( 860 ) 896 − 4920 | March 25, 2025 |

| ☒ Judicial District ☐ Housing Session | G.A. Number: | At *(City/Town)* Tolland | Case type code *(See list on page 2)* Major: **T90**   Minor: **All** |
|---|---|---|---|

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(if attorney or law firm)* |
|---|---|
| Michael Thad Allen, PO Box 404, Quaker Hill, CT 06375 | 435762 |

| Telephone number | Signature of plaintiff *(if self-represented)* |
|---|---|
| ( 860 ) 772 − 4738 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case. Any attorney who is not exempt from e-filing is required to accept electronic delivery. (Practice Book Section 10-13)   ☒ Yes  ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book mallen@allenharrislaw.com ⊞ |
|---|---|

| Parties | Name *(Last, First, Middle Initial)* and address of each party *(Number; street; P.O. Box; town; state; zip; country, if not USA)* | |
|---|---|---|
| **First plaintiff** | Name: Sherry Zane<br>Address: 11 Rham, Hebron, CT 06248 | P-01 |
| **Additional plaintiff** | Name:<br>Address: | P-02 |
| **First defendant** | Name: Kimberly Hill<br>Address: 343 Mansfield Rd., UNIT 1177, Storrs, CT 06269 | D-01 |
| **Additional defendant** | Name: Kimberly Hill<br>Address: 343 Mansfield Rd., UNIT 1177, Storrs, CT 06269 | D-02 |
| **Additional defendant** | Name: Ofer Harel<br>Address: 343 Mansfield Rd., UNIT 1177, Storrs, CT 06269 | D-03 |
| **Additional defendant** | Name: Anne D'Alleva<br>Address: 343 Mansfield Rd., UNIT 1177, Storrs, CT 06269 | D-04 |

| Total number of plaintiffs: 1 | Total number of defendants: 5 | ☒ Form JD-CV-2 attached for additional parties |
|---|---|---|

## Notice to each defendant

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.

2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.

3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.

4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.

5. If you have questions about the summons and complaint, you should talk to an attorney.
   **The court staff is not allowed to give advice on legal matters.**

| Date March 7, 2025 | Signed *(Sign and select proper box)* | ☒ Commissioner of Superior Court ☐ _____ Clerk | Name of person signing Michael Thad Allen, Esquire |
|---|---|---|---|

| If this summons is signed by a Clerk: | *For Court Use Only* |
|---|---|
| a. The signing has been done so that the plaintiff(s) will not be denied access to the courts.<br>b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law.<br>c. The court staff is not permitted to give any legal advice in connection with any lawsuit.<br>d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint. | File Date |

| I certify I have read and understand the above: | Signed *(Self-represented plaintiff)* | Date | Docket Number |
|---|---|---|---|

## Instructions

1. Type or print legibly. If you are a self-represented party, this summons must be signed by a clerk of the court.

2. If there is more than one defendant, make a copy of the summons for each additional defendant. Each defendant must receive a copy of this summons. Each copy of the summons must show who signed the summons and when it was signed. If there are more than two plaintiffs or more than four defendants, complete the Civil Summons Continuation of Parties (form JD-CV-2) and attach it to the original and all copies of the summons.

3. Attach the summons to the complaint, and attach a copy of the summons to each copy of the complaint. Include a copy of the Civil Summons Continuation of Parties form, if applicable.

4. After service has been made by a proper officer, file the original papers and the officer's return of service with the clerk of the court.

5. Use this summons for the case type codes shown below.

   Do not use this summons for the following actions:

   (a) Family matters (for example divorce, child support, custody, parentage, and visitation matters)
   (b) Any actions or proceedings in which an attachment, garnishment or replevy is sought
   (c) Applications for change of name
   (d) Probate appeals

   (e) Administrative appeals
   (f) Proceedings pertaining to arbitration
   (g) Summary Process (Eviction) actions
   (h) Entry and Detainer proceedings
   (i) Housing Code Enforcement actions

## Case Type Codes

| MAJOR DESCRIPTION | CODE | MINOR DESCRIPTION | MAJOR DESCRIPTION | CODE | MINOR DESCRIPTION |
|---|---|---|---|---|---|
| Contracts | C 00 | Construction - All other | Property | P 00 | Foreclosure |
| | C 10 | Construction - State and Local | | P 10 | Partition |
| | C 20 | Insurance Policy | | P 20 | Quiet Title/Discharge of Mortgage or Lien |
| | C 30 | Specific Performance | | P 30 | Asset Forfeiture |
| | C 40 | Collections | | P 70 | Dissolution of Lien Upon Substitution of Bond |
| | C 50 | Uninsured/Underinsured Motorist Coverage | | P 90 | All other |
| | C 60 | Uniform Limited Liability Company Act - C.G.S. 34-243 | Torts (Other than Vehicular) | T 02 | Defective Premises - Private - Snow or Ice |
| | C 90 | All other | | T 03 | Defective Premises - Private - Other |
| Eminent Domain | E 00 | State Highway Condemnation | | T 11 | Defective Premises - Public - Snow or Ice |
| | E 10 | Redevelopment Condemnation | | T 12 | Defective Premises - Public - Other |
| | E 20 | Other State or Municipal Agencies | | T 20 | Products Liability - Other than Vehicular |
| | E 30 | Public Utilities & Gas Transmission Companies | | T 28 | Malpractice - Medical |
| | E 90 | All other | | T 29 | Malpractice - Legal |
| Housing | H 00 | Housing - Summary Process | | T 30 | Malpractice - All other |
| | H 03 | Housing - Deceased Tenants - Summary Process | | T 40 | Assault and Battery |
| | H 10 | Housing - Return of Security Deposit | | T 50 | Defamation |
| | H 12 | Housing - Rent and/or Damages | | T 61 | Animals - Dog |
| | H 20 | Housing - Housing Code Enforcement | | T 69 | Animals - Other |
| | H 30 | Housing - Entry and Detainer | | T 70 | False Arrest |
| | H 40 | Housing - Audita Querela/Injunction | | T 71 | Fire Damage |
| | H 50 | Housing - Administrative Appeal | | T 90 | All other |
| | H 60 | Housing - Municipal Enforcement | Vehicular Torts | V 01 | Motor Vehicles* - Driver and/or Passenger(s) vs. Driver(s) |
| | H 70 | Housing - Bed Bug Infestation | | V 04 | Motor Vehicles* - Pedestrian vs. Driver |
| | H 87 | Housing - Denied Fee Waiver Appeal | | V 05 | Motor Vehicles* - Property Damage only |
| | H 90 | Housing - All Other | | V 06 | Motor Vehicle* - Products Liability Including Warranty |
| Miscellaneous | M 00 | Injunction | | V 09 | Motor Vehicle* - All other |
| | M 10 | Receivership | | V 10 | Boats |
| | M 15 | Receivership for Abandoned/Blighted Property | | V 20 | Airplanes |
| | M 20 | Mandamus | | V 30 | Railroads |
| | M 30 | Habeas Corpus (extradition, release from Penal Institution) | | V 40 | Snowmobiles |
| | M 40 | Arbitration | | V 90 | All other |
| | M 50 | Declaratory Judgment | | | *Motor Vehicles include cars, trucks, motorcycles, and motor scooters. |
| | M 63 | Bar Discipline | | | |
| | M 66 | Department of Labor Unemployment Compensation Enforcement | Wills, Estates and Trusts | W 00 | Probate Appeals |
| | M 68 | Bar Discipline - Inactive Status | | W 10 | Construction of Wills and Trusts |
| | M 70 | Municipal Ordinance and Regulation Enforcement | | W 90 | All other |
| | M 75 | Foreign Subpoena - C.G.S. 52-657 | | | |
| | M 80 | Foreign Civil Judgments - C.G.S. 52-604 & C.G.S. 50a-30 | | | |
| | M 83 | Small Claims Transfer to Regular Docket | | | |
| | M 84 | Foreign Protective Order | | | |
| | M 85 | Civil Protection Order | | | |
| | M 87 | Denied Fee Waiver Appeal | | | |
| | M 88 | Application for Pro Hac Vice for State or Municipal Agency/Board | | | |
| | M 89 | CHRO Action in the Public Interest - P.A. 19-93 | | | |
| | M 90 | All other | | | |

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2    Rev. 9-12

STATE OF CONNECTICUT
**SUPERIOR COURT**

First named Plaintiff *(Last, First, Middle Initial)*

First named Defendant *(Last, First, Middle Initial)*

## Additional Plaintiffs

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| | | 03 |
| | | 04 |
| | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |
| | | 12 |
| | | 13 |

## Additional Defendants

| Name *(Last, First, Middle Initial, if individual)* | Address *(Number, Street, Town and Zip Code)* | CODE |
|---|---|---|
| University of Connecticut, 343 Mansfield Road, UNIT 1177, Storrs, CT 06269-1177 | | 05 |
| | | 06 |
| | | 07 |
| | | 08 |
| | | 09 |
| | | 10 |
| | | 11 |

| | | *FOR COURT USE ONLY - File Date* |
|---|---|---|
| | 12 | |
| | 13 | |
| | 14 | Docket number |

**CIVIL SUMMONS-Continuation**

DOCKET NO. TTD-CV25-6032443-S

| | |
|---|---|
| SHERRY ZANE, | |
| Plaintiff | SUPERIOR COURT |
| | JUDICIAL DISTRICT |
| vs. | OF TOLLAND |
| KIMBERLY HILL, THE UNIVERSITY OF CONNECTICUT, and OFER HAREL, ANNE D'ALLEVA, and RADENKA MARIC, in their official capacity as state actors, | AT VERNON |
| | DATE: March 5, 2025 |
| Defendants. | |

**COMPLAINT**

1.      Plaintiff Sherry Zane brings this civil action in defamation against Kimberly Hill and against the University of Connecticut under Conn. Gen. Stat. §§ 31-71a, et seq., as well is against the Defendants Ofer Harel, Anne D'Alleva, and Radenka Marik in their official capacity as state actors under the Takings Clause of the Fifth Amendment to the United States Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution to recover wages that she rightfully earned but which the University of Connecticut ("UConn"), her employer, first forced her to withhold and sequestered in an unrestricted account while requiring her to earn these wages through extra work, meaning that she had to earn her wages twice over.

2.      Then, as part of a pretextual investigation and hearing to divest Professor Zane of these rightfully earned wages, Defendant Kimberly Hill intentionally defamed and published false statements in order to ruin the reputation of Professor Zane and get her arrested for "larceny" due to Professor Zane's insistence that she be paid her own rightfully earned wages.

3.      In particular, Defendant Hill issued a so-called "Report" (dated November 14, 2024), which is clearly erroneous on its face. Defendant Hill not only published this Report but then UConn supplied the Report to law enforcement to get Professor Zane arrested. UConn then supplied the

defamatory statements once again to the Hartford Courant, so that Professor Zane could be dragged in the public sphere.

4.      Plaintiff Sherry Zane seeks all legal and injunctive remedies arising from UConn's failure to compensate her for over $80,000 of sequestered wages and for reputational damages arising from defamation per se.  She also seeks an injunction ordering UConn to disgorge her improperly withheld wages and for reinstatement.

## I.    JURISDICTION AND VENUE

5.      This Court has jurisdiction under Conn. Gen. Stat. § 51-164s and § 31-72.  The state of Connecticut has waived sovereign immunity with regard to claims under Conn. Gen. Stat. § 31-71a, et seq., specifically under § 31-72.[1]

6.      This Court has jurisdiction over Defendant Harel, Defendant D'Alleva, and Defendant Maric in their official capacities as state actors under the *Ex Parte Young* doctrine.

7.      Venue is proper in the Judicial District of Tolland under Conn. Gen. Stat. § 51-345(3) because all parties reside within this Judicial District.

## II.   PARTIES

8.      The University of Connecticut ("UConn") is the flagship public university of the state of Connecticut, with its principal place of business in Storrs, Connecticut.  The University of Connecticut is an "employer" within the meaning of Conn. Gen. Stat. § 31-71(1).

9.      Kimberly Hill is Director of University Compliance of the University of Connecticut and on information and belief is a resident of Connecticut.

10.     Ofer Harel is the Dean of the College of Liberal Arts and Sciences and professor in the Department of Statistics at the University of Connecticut and at all relevant times had the authority

---

[1] See e.g., Alosi v. Univ. of Conn., No. TTDCV216021662S, 2021 Conn. Super. LEXIS 1473, at *2-4 (Super. Ct. Sep. 8, 2021) ("the state has clearly waived sovereign immunity under § 31-72")

to hire, fire, and promote Professor Zane during the wrongful expropriation of Professor Zane's wages. On information and belief Defendant Harel is a resident of Connecticut.

11.    Anne D'Alleva is Provost and Executive Vice President for Academic Affairs at the University of Connecticut and at all relevant times had the authority to hire, fire, and promote Professor Zane and ensure that the rules and procedures of the University of Connecticut were followed during the wrongful expropriation of Professor Zane's wages. On information and belief Defendant D'Alleva is a resident of Connecticut.

12.    Radenka Maric is the acting President of the University of Connecticut and at all relevant times had the authority to hire, fire, and promote Professor Zane and ensure that the rules and procedures of the University of Connecticut were followed during the wrongful expropriation of Professor Zane's wages. On information and belief Defendant Maric is a resident of Connecticut.

13.    Sherry Zane is a citizen of Connecticut and resides in Hebron. Sherry Zane was Professor in Residence and Director of Women's, Gender, and Sexuality Studies ("WGSS") in the Department of Social and Critical Inquiry ("SCI") at the University of Connecticut. Sherry Zane was an employee within the meaning of Conn. Gen. Stat. § 31-71(2).

## III.    FACTS

### A.    Sherry Zane Accepts Employment at UConn and Agrees to Perform Extra Work for which her Compensation Was Withheld

14.    Sherry Zane was Professor in Residence and Director of Women's, Gender, and Sexuality Studies ("WGSS") in SCI at the University of Connecticut, at its flagship campus in Storrs, Connecticut.

15.    Professor Zane began working as a teaching professor at University of Connecticut, Storrs in August of 2013. Her starting salary was less than $50,000. Thus, the amount of wages the University of Connecticut has withheld and confiscated from Professor Zane exceeds her original annual salary.

3

16.     Beginning on or around the year 2015, Professor Zane was offered and accepted the responsibility for designing and teaching summer courses that had been approved by Professor Nancy Naples, the Director of Women's, Gender and Sexuality Studies.

17.     By May 21, 2024, Professor Zane was offered and accepted the position of Professor in Residence and Area Director of the Women's, Gender, and Sexuality Studies Program in UConn's College of Liberal Arts and Sciences.

18.     However, due to bureaucratic inflexibility, Professor Zane could not be paid for substantial amounts of extra work and service to UConn because of UConn's collective bargaining agreement with the American Association of University Professors ("AAUP").

19.     By way of example, her last offer letter as Professor in Residence and Area Director of the Women's, Gender, and Sexuality Studies Program expressly states, "Earnings may not exceed the equivalent of a twelve-month salary under the "Extra Compensation Policy for Full-time Faculty in AAUP."

20.     Under the effective collective bargaining agreements, UConn tightly controls how much each professors' work is eligible for compensation yet still requires faculty to do additional work. UConn merely requires this without compensation.  The University of Connecticut promulgates "maximum effort and compensation" tables.

21.     UConn's relevant policy states: "Time and pay for faculty working on externally funded sponsored projects or the equivalent effort on university funds cannot exceed the daily rate of pay for daily effort (i.e., max pay cannot be condensed and paid out over a shorter period)."

22.     However, the University of Connecticut's policies do provide for payment to be withheld where it coerces faculty to work extra:

> Summer salary compensation may be waived if the faculty member chooses to accept payment in the form of faculty research funds. Such requests must be clearly documented, in advance of performing services, in line with the Procedures. Waived compensation in the form of faculty research funds is not considered

personal compensation and cannot be used to supplement a faculty member's full-time annual salary or summer salary in future years. Waived compensation is not included in the determination of the aforementioned maximum compensation.

In other words, by legerdemain, UConn asks professors to work but refuses to pay them unless they work for their compensation twice over, for example, once in the form of extra teaching, and then a second time in the form of research in service to the university.

23.     Professor Zane earned deferred compensation by teaching extra classes, revising coursework, or serving on a committee that works over the summer.  Then, she had to earn her compensation once again by engaging in faculty research or other service to the University.  In that event, she was allowed to draw down funds which were basically withheld compensation to cover the travel fees, expenses, materials, or other costs.

24.     Attached as **Exhibit 1** is the Affidavit of Cathy Schlund Vials.  Professor Schlund Vials is currently the Iris Howard Regents Professor of English Literature in the Department of English and the Center for Asian American Studies at the University of Texas at Austin.  In 2018, however, she was Associate Dean for Humanities, Diversity, Equity, and Inclusion in the University of Connecticut's College of Liberal Art and Sciences ("CLAS").  In 2019, Professor Schlund Vials was appointed to the position of University of Connecticut Board of Trustees Professor (in English and Asian/Asian American Studies).  And in 2018-2019, Professor Schlund Vials served as Interim Director of the Women's Gender and Sexuality Studies Program ("WGSS") at the University of Connecticut.  Id., ¶ 1.

25.     On August 2, 2018, in her capacity as Interim Director and Associate Dean, Professor Schlund Vials executed an agreement with Professor Zane captioned "Agreement to Waive Compensation."  Id., ¶ 2.  This Agreement is attached as Exhibit A to the Affidavit of Professor Schlund Vials.  Id.  The agreement provided that wages earned by Professor Zane would be diverted to an "unrestricted University account."

26.    Professor Zane entered into a contract with UConn that stated, "Agreement to Waive Compensation":

> faculty may waive compensation and remit **funds to any unrestricted University account**, provided it meets the guidelines described in Section 5 of the Procedures for the Faculty Compensation Policy.  A faculty member who chooses to waive compensation for an assignment must complete this and submit it to HR before any work begins.

(Emph. added.).

27.    By the plain language of the contract, the account could be used for "a wide variety of purposes" consistent with the University's mission, not exclusively "research."  Id.  For example, "teaching … supplies or equipment, scholarly travel, and related expenses."  Id.

28.    The account was to be used for Professor Zane's sole benefit and was a repository for her rightfully earned wages.  The agreement was intended to ensure that Sherry Zane had direct access to those already earned monies in a manner consistent with University policy and procedure.  Id., ¶ 5.  This account held the compensation for Sherry Zane, which she had earned by teaching classes or other service to the University, but which the University refused to pay her directly.  Id., ¶ 8.

29.    Professor Zane has also served as a "faculty navigator" on UConn's new Common Core Courses and Curriculum Committee, which met weekly to help guide UConn's GED classes to a new curriculum.  This work was not compensated but instead diverted to an unrestricted account for her future use, provided that she again did double duty to earn it as "travel" or other expenses.

30.    Professor Zane also received a Provost's Course Revision Grant to revise two courses over the summer of 2024.  Again, she was not compensated, and the funds were diverted into an unrestricted account for future use, provided that she again did double duty to earn it as "travel" or other expenses.

6

**B.  UConn's Bureaucratic Ruse to Seize Professor Zane's Rightfully Earned Compensation**

31.     Professor Zane agreed to this form of withheld compensation over close to a decade of employment at UConn.  On information and belief, Professor Zane accumulated in excess of $80,000 in withheld compensation, a large portion of which is still withheld by UConn and which UConn has now seized without just compensation.

32.     By way of example, in the spring of 2024 (May 13, 2024), Professor Zane entered into an agreement as a "Special Payroll Lecturer."  She formally agreed to teach various additional credits beyond the scope of her ordinary employment contract for compensation.  This work directly benefited UConn and its students.

33.     Professor Zane was again not paid except to divert withheld compensation to an unrestricted account of the kind set up by Professor Schlund Vials.

34.     On information and belief, there is only one such account with a unique account number reserved only for Professor Zane.

35.     Professor Zane taught her first, uncompensated extra course starting around the year 2015 and many courses and administrative services were provided thereafter by Professor Zane under this type of agreement.

**C.  All of Professor Zane's Travel Was Pre-and Post-Approved by the University of Connecticut**

36.     From time to time, Professor Zane engaged in travel and expended funds for her research or to inform her teaching.  All of these trips were preapproved by UConn's administration and the receipts submitted for compensation were again approved after the trips were completed.

37.     There are three levels of approval which Professor Zane had to go through to receive her withheld compensation that was already rightfully owed to her.

38.     First, she had to get pre-approval to book a trip.

7

39.     Second, she had to get approval from the College of Liberal Arts and Sciences'
business office when she returned.

40.     Finally, she had to get approval from the UConn travel office for her receipts for any
"reimbursement" even after she had worked twice to earn the compensation originally owed to her.

41.     In every case, Professor Zane satisfied this three-step approval process, which was
itself laborious, uncompensated work.

42.     This process has also been described by Professor Schlund Vials:

> Those seeking reimbursement from a research account for academic travel were
> required to fill out a pre-approval travel form; a pre-established workflow, the travel
> request would be subject to approval by designated supervisors, the Fiscal Officer
> charged with overseeing the specific account, and the Accounts Payable Office.
> This workflow is meant to ensure compliance with university policy and protocol
> at multiple levels. Illustratively, while serving as Associate Dean, there were three
> instances that I did not approve the pre-approval request due to instances of
> noncompliance.

43.     Thus, at each step, if Professor Zane's travel or research was somehow illegitimate or
mistaken, this was subject to scrutiny and approval.

44.     UConn cannot identify any application for Professor Zane's that it did not preapprove.
No trip for which Professor Zane applied to use withheld compensation had ever been identified as
illegitimate or somehow an improper use of the withheld compensation.

45.     UConn was also free to reject receipts submitted for reimbursement.  See e.g., **Exhibit
A**, ¶ 12.  For example, when Professor Schlund Vials was an associate Dean at UConn, she recalls
disapproving at least three submitted travel receipts (not related to Professor Zane).

46.     By way of example, on one occasion Professor Zane submitted a taxi receipt for travel
costs which the taxi driver had simply given her to fill out on her own by hand.  This was the only
receipt in Professor Zane's memory that UConn ever rejected.  In that case, Professor Zane had
incurred the cost, but UConn denied her access to her own previously earned wages to cover it.

47. For most of the period at issue in this complaint, the administrative responsibility for approving or disapproving receipts and travel fell to Professor Katherine Capshaw, Professor of English and Associate Dean.

48. Thus, Professor Zane's trips and application for her withheld compensation were agreed upon ahead of time by UConn, as well as after the fact by her direct supervisor, (most recently Katherine Capshaw).

49. There is no policy or rule at the University of Connecticut that makes the so-called "Office of Compliance" or its Director Defendant Kimberly Hill the arbiter of what is or is not legitimate research activity or activity that informs professors' teaching for Professors like Sherry Zane. On information and belief, Director Hill has no scholarly training in any field of study related to Professor Zane's work. Kimberly Hill has no expertise in the areas of study which fall under the programs and activities of the WGSS.

50. However, those who do have such expertise attest that Professor Zane's activities were related directly to her teaching and research in the service of UConn.

51. Attached to this complaint as **Exhibit B** and **Exhibit C** are the Affirmations (the equivalent of an affidavit under New York law) of Françoise Dussart and Laura Mauldin, professors of the University of Connecticut who are qualified to judge whether Professor Zane's activities constituted research in her field.

52. Professor Dussart is a professor of anthropology and an affiliate of the WGSS program. **Exhibit B**, ¶ 2. She has known Professor Zane for over 10 years and shares her academic interests and pursuits; she has discussed Professor Zane's research with her. Id., ¶ 3, 5. She has traveled to Belfast and discussed Professor Zane's research which the latter also conducted in Belfast. Id., 7-9. Based on her professional experience, she believes Professor Zane's trips to Belfast were tied to Professor Zane's professional and academic research. Id., ¶¶ 9-10.

53.     Laura Mauldin is an associate professor in the Department of Social and Critical Inquiry at the University of Connecticut and is appointed in the WGSS program.  **Exhibit C**, ¶ 2.  She is familiar with Professor Zane's research agenda.  Id.  She discusses Professor Zane's research and academic interests with her and collaborates with her.  Id., ¶ 5.  Based on Professor Mauldin's professional experience and direct knowledge of Professor Zane's work, she can say that Professor Zane's trips to Belfast and Disney were undoubtedly tied to her professional and academic research.  Id., ¶ 6.

54.     No one from the University of Connecticut ever bothered to consult Professor Dussart for her expertise in evaluating whether or not Professor Zane's activities constituted research in her field.  **Exhibit B**, ¶ 16.  No one from the University of Connecticut ever bothered to consult Professor Mauldin for her expertise in evaluating whether or not Professor Zane's activities constituted research in her field.  **Exhibit C**, ¶ 10.

55.     Professor Zane continued to teach extra classes without compensation.  She accumulated "research" funds in the unrestricted account which UConn Maintain on her behalf.

56.     Given that Professor Zane's activities were pre-and post-approved and that the faculty qualified to judge her academic research considered these activities legitimate, it is unsurprising that over the course of years, Professor Zane took trips or engaged in research; or she acquired materials, or she incurred other expenses to the benefit of UConn that were not compensated.  And she then asked for reimbursement from her unrestricted account for costs, which was reimbursed.  However, in many cases Professor Zane's costs were not all reimbursed, and she continued to foot the bill or find workarounds so that she could afford such travel, for example, by staying for free in her parents' home even when she might have otherwise been entitled to submit hotel receipts for reimbursement.  This also directly benefited UConn.

57.    No one at UConn ever objected to Professor Zane's use of her withheld compensation over an entire decade.

58.    In some cases, Professor Zane expended her withheld compensation on bringing guest speakers and lectures to campus for the benefit of UConn and its students, for which Professor Zane was never compensated.  In fact, this "workaround" resulted in UConn paying Professor Zane's compensation to guest speakers.

59.    All of this was preapproved, and approved after submission of receipts, most recently by Katherine Capshaw, who is now Associate Dean for Diversity, Equity, and Inclusion after Professor Schlund Vial's departure and Professor Zane's immediate supervisor.

60.    On information and belief, more than $20,000 remained in Professor Zane's "research account" as deferred compensation at the time that UConn seized it.

### D.  UConn's Pretextual Investigation and Director Hill's Intentional Defamation of Professor Zane

61.    On February 15, 2024, Director of University Compliance, Defendant Kimberly Hill contacted Professor Zane and notified her that she was placed under "investigation."

62.    The investigation was a pretextual means to clawback and confiscate Professor Zane's withheld compensation for which Professor Zane was already forced to work twice over to redeem.

63.    The Investigator reported in a Report dated November 14, 2024 (the "Report") that

> Dr. Zane's appointment as an in-residence faculty member is predominantly for the purpose of teaching courses. University Compliance recognizes that while some in-residence faculty have a portion of their appointment reserved for research, Dr. Zane is not one of them.

This was completely unsubstantiated and lacked any basis in fact.  In short, it is blatantly false, and it is a statement made in bad faith.  Documents from the University of Connecticut demonstrate that an account was set up for Professor Zane and held her already earned compensation for the purposes

of research and other activities related to her duties in the service of UConn.  See Exhibit 1 to **Exhibit A** and ¶¶ 10-11.

64.     As Professor Schlund  Vials has stated under oath:

> I have evaluated the [above] statement [by Defendant Hill in the Report]. . . I know from my personal, direct experience, including from my experience setting up the account for Professor Zane memorialized in Exhibit A, that this statement is misleading and inaccurate in that it misrepresents Professor Zane as "not one of them," meaning faculty who conduct research. The absence of such a mention fails to account for the fact that full-time faculty (inclusive of in-residence faculty) are able to apply for AAUP Professional Development Funds, which encompass "any academic-related travel expenses."

During the course of UConn's and Director Hill's pretextual investigation, Director Hill was informed by Professor Zane on multiple occasions that she had the right to the monies in the account in question, that she had legitimate research interests, and legitimate travel.  Nevertheless, Director Hill misrepresented multiple times in her so-called Report that Professor Zane's was not entitled to conduct research as a UConn employee.  Thus, Director Hill made the statements knowing they were intentionally false.

65.     This was not the only intentionally false statement made by Investigator/Director Hill. In addition to many other false statements, Director Hill stated that Professor Zane intended to explore the creation of an international study abroad program, but "there was no evidence that Dr. Zane developed a study abroad program nor did Dr. Zane provide any documentation of such work."

66.     This was another knowingly false statement when made by Director Hill.

67.     Professor Zane obtained and submitted a statement from Peter Lismore, Financial Director of the Ullans Academy (The Academy of Ulster Scots (ULLANS) Limited), dated October 28, 2024 and provided this statement to the investigation.  Director Lismore stated:

> I met Sherry Zane February, July and November of 2023 in my capacity as Financial Director of the Ullans Academy, where we discussed her research here in Belfast She talked about the impact of street art on public memory and how she wanted to build a study abroad program to bring students from the University of Connecticut to Belfast to explore women's roles in the Troubles and their impact on

peacebuilding. I told her to let me know if there was any way I could help to support her endeavors here.

This statement is attached as **Exhibit D**. Of course, because this evidence was exculpatory and the investigation was pretextual, this evidence was ignored in order to portray Professor Zane as some sort of felon who had stolen taxpayer money.

68.    The Investigator reported that Professor Zane used the funds, which she had already earned and had been withheld from her as wages, for her own "personal gain."

69.    Professor Zane had used funds to develop work on a book, provisionally titled "Surveilling Sex." The investigator counted as evidence of Professor Zane's illegitimate use of funds that she did not have a "book contract" for this book. Anyone who knows the slightest thing about academic publishing knows that academics typically do not have book contracts in advance of publishing manuscripts. Yet this did not matter in the "investigation," which was conducted in bad faith.

70.    The "investigation" was a pretext to find Professor Zane "responsible" for misusing "University" funds, funds that were in actuality withheld compensation that Professor Zane had already earned, and which UConn now sought to confiscate illegally.

71.    Another example of intentionally false representations in the "investigation" was that Director Hill faulted Professor Zane for only providing the first names of attendees at meals which she had paid for while on pre-approved travel, although a total of 17 business meals during one trip accounted for less than $900. (This amounts to less than $53 per meal, regardless of how many people Professor Zane allegedly hosted improperly.)

72.    Yet Professor Zane had never concealed that she kept the names of individuals whom she interviewed anonymous because of many participated in the Troubles of Northern Ireland. In fact, contemporaneous documents indicated that Professor Zane proposed keeping the names of the persons interviewed anonymous to the University of Connecticut's Institutional Review Board

("IRB").  The IRB is responsible for approving certain kinds of research that involved human subjects, such as experimentation in psychology, or the like.  An IRB exists in any institution that engages in research on human subjects.

73.     The application from May 21, 2022 explains: "If they [human subjects] choose for their participation to be CONFIDENTIAL, their name will not be included in any interview transcript, and they can choose whether or not they would like to have an audio or video recording preserved from the interview."

74.     There was a good reason to keep the names anonymous.  In 2019, a scandal had erupted at Boston College in which confidential tapes of "Troubles confessions" had led to the Police Service of Northern Ireland to launch a legal bid to force the college to hand over the transcripts.  See Boston tapes: Q & A on secret Troubles confessions, BBC, October 17, 2019.

75.     Therefore Professor Zane resolved to keep the subjects of her interviews anonymous. There is no evidence that this approach or method was ever discouraged or that a trip for such activities was ever declined or disapproved.

76.     This was told to Investigator/Director Hill but of course ignored because Defendant Hill's was not so much "investigating" is trying to drum up a damning story in bad faith.

77.     Director Hill intentionally misrepresented the maintenance of anonymity as follows:

University Compliance asked Dr. Zane who attended the meals and for what purpose. Dr. Zane indicated all names were coded alias names to protect the privacy of attendees.

Upon request, Dr. Zane submitted the full names of the attendees for the 10 meals to University Compliance. In comparing the names documented on receipts and/or expense reports with those submitted by Dr. Zane, one attendee had multiple different coded aliases. For example, one person who attended multiple meals during this trip was listed as "Jesse W" for one meal, but as "Mandy" for another. Therefore, Dr. Zane's coded aliases were either inaccurate or Dr. Zane provided inaccurate information to University Compliance.

14

78.     Thus, not only was UConn's pretextual investigation calculated to nickel and dime Professor Zane out of every last dollar of her withheld compensation, but Director Hill also intentionally cast Professor Zane's already disclosed intention to keep participants anonymous as a nefarious effort to defraud so-called "University Compliance."

79.     Although the withheld-compensation arrangement required Professor Zane to work double time to gain the compensation she had already earned, she was also faulted by the so-called Investigator for not declaring "personal days" when she took trips that she billed to the "research [i.e. deferred compensation] account."

80.     "Personal days" was a concept apparently made up by the investigator.  This alleged requirement appears nowhere in UConn's policies, handbooks, or procedures and rules.

81.     Professor Zane was also faulted that she had bought books with her "research account."  The investigator found that this was also not permissible, although books are obviously the lifeblood of academic research and publishing.

82.     According to Defendants Hill almost everything Professor Zane did while on research travel was for "personal use," "personal purchases," an otherwise "not permissible"— even though the entire point of sequestering Professor Zane's withheld compensation was so that she could use it for her personal research trips.  If Professor Zane traveled on the weekend to the location of her research, she was faulted for not traveling on a weekend when archives are typically closed and then traveling back on a weekend.  Yet when she traveled on the weekend, and visited her mother in the area, this was also evidence to the so-called "Investigator" of misuse of funds.  No matter when Professor Zane traveled, it was always somehow a reason to confiscate her already earned wages.

83.     In one sham interview, the Investigator cut short a discussion with Professor Capshaw, who was explaining that the procedures by which Professor Zane applied for and used her withheld

compensation account were perfectly normal at the University of Connecticut. As soon this was explained to Defendant Hill, she told Professor Capshaw the meeting was "over."

84. It was also important to exclude other exculpatory evidence. In fact, during the investigation Professor Zane was put on leave and cut off from her University email account so that she could not have access to documents and files necessary to prepare and present her defense. The "investigation" was a kangaroo-court process from the start.

85. Professor Zane was denied access to the evidence against her. Professor Zane was never provided a hearing, nor was the investigator subject to cross-examination nor were any other witnesses against Professor Zane.

86. UConn called a sham "hearing," before Dean Ofer Harel for March 11, 2025. However, in the lead up to the so-called "hearing" at which the foregone conclusion had already been announced to her counsel, namely termination, University of Connecticut counsel Kelly Bannister informed Professor Zane that the following hallmarks of due process would be disregarded:

    a. Professor Zane was not allowed to know the identity of her accuser.

    b. Professor Zane was denied the right to cross examine "Investigator" Kimberly Hill.

    c. Professor Zane was denied the right to summon witnesses. By way of example, Professor Capshaw—undoubtedly terrified that UConn had had her colleague arrested and smeared her in the public sphere as a felon— would not agree to speak to Professor Zane's counsel and at the time of this filing is not required to attend the hearing as a witness.

    d. The burden of proving her own innocence was placed on Professor Zane, rather than being presumed innocent.

e. Questions submitted to UConn counsel Kelly Bannister to pose to "Investigator" Kimberly Hill were disregarded, despite overwhelming evidence that Investigator Hill had intentionally misrepresented, inter alia, Professor Zane's legitimate property interest in her withheld wages and research fund.

f. Despite repeated inquiries, the University of Connecticut refused to specify what procedures or process would apply in the so-called "hearing," which was itself pretextual. Attorney Bannister limited the so-called "hearing" to an hour and a half.

87. Professor Zane was also told she could not speak with any colleagues, faculty, or students, many of whom were direct witnesses, whom she needed to contact to defend herself.

88. The Investigator showed absolutely no understanding for academic research in Professor Zane's field of study. Multiple professors explained to the Investigator that Professor Zane's research was perfectly legitimate in her field. This evidence was ignored in order to justify confiscating Professor Zane's withheld compensation. **Exhibit A**, **Exhibit B**, **Exhibit C**.

89. Professor Zane was found responsible for "a clear misuse of university funds" for doing nothing more than claiming withheld compensation.

90. The withheld compensation, which UConn had initially forced Professor Zane to earn twice over, has now been put beyond her reach, seized, and clawed back by UConn.

91. Prior to any final determination of responsibility for accessing her own rightfully earned wages, the University of Connecticut provided the defamatory "Report" of Director Hill to state law enforcement. The University of Connecticut thus had a warrant issued for Sherry Zane's arrest. Professor Zane was arrested and charged with larceny on February 13, 2025 based on false information provided by, in particular, investigator Hill.

92. Then, on or around February 25, 2025, UConn provided a false and defamatory statement to the Hartford Courant, resulting in an article smearing Professor Zane as a felon. UConn also made sure that Professor Zane's personal address and contact information was disclosed by the Hartford Courant.

93. Professor Zane has begun to receive hate mail, an example of which is attached as **Exhibit F**, filled with expletives, as a direct result of UConn's and Investigator Hill's intentional defamation of her character and reputation.

94. Despite repeatedly providing evidence to UConn, in particular to its counsel Kelly Bannister and Nicole Gelston, that material statements in Director Hill's so-called "Report"; UConn refused and refuses to notify law enforcement or the media that Director Hill made materially false statements in her "Report." For example, UConn has refused to inform law enforcement or the media that Professor Zane is indeed entitled to the research account and research trips, contrary to Director Hill's obviously false statement to the contrary.

95. Professor Zane has effectively been forced to work without compensation, and not only that, but UConn also now smears and defames her as someone who is allegedly embezzling funds. In reality, UConn, clothed by the full authority of the state of Connecticut, is stealing rightfully earned compensation from Professor Zane.

## COUNT I:
## CONN. GEN. LAWS, § 31-72
## (ILLEGAL CONFISCATION OF WAGES | FAILURE TO PAY FAIR WAGES)

96. Professor Zane incorporates all foregoing paragraphs in this paragraph as if fully restated here.

97. UConn is an employer as defined by Conn. Gen. Stat. § 31-71(1).

98. At all relevant times, Professor Zane was an employee of UConn as defined by Conn. Gen. Stat. § 31-71(2).

18

99.    The State of Connecticut has waived sovereign immunity for all claims under § 31-71a, et seq.  The State of Connecticut has no sovereign immunity with regard to its failure to pay due wages to Professor Zane.

100.    Over the course of ten years, Professor Zane was compelled to work extra without compensation, for example but not limited to teaching additional courses and developing curricula for UConn students.

101.    UConn benefited from Professor Zane's extra, uncompensated work.  Professor Zane's extra work enriched the learning experience of UConn students.  UConn also generated extra revenue for its programs, including but not limited to WGSS.  WGSS received a percentage of revenue for its budget from the summer classes taught, which the current Dean, Defendants Harel, and previous Dean Julie Wade praised as an example to be followed by other departments and programs.

102.    Over the course of ten years, Professor Zane earned in excess of $80,000 in compensation which was not paid.  This amount is to be determined in discovery.

103.    Rather than pay Professor Zane, UConn forced Professor Zane to accept deferred compensation in the form of a "research fund" which was expressly designated as "unrestricted."

104.    This was not voluntary.  Professor Zane was coerced and required to engage in uncompensated labor against the promise of a "research account."

105.    If and only if Professor Zane did additional work was she allowed to submit receipts for travel, meals, work materials, and finally get her already-earned compensation as "reimbursement."

106.    In short, UConn's system required Professor Zane to work twice as much for the pay which she had rightfully earned.

107.    Instead of paying Professor Zane for the value of her work that directly benefited UConn, UConn started a pretextual investigation to confiscate and claw back Professor Zane's rightfully earned wages.

108.    Instead of paying Professor Zane for the value of her work that directly benefited UConn, UConn has obstructed Professor Zane's access to her unrestricted account, placed her on leave, obstructed her access to exculpatory evidence, and now threatens to terminate her employment and benefits, including tuition waiver for her college age child.

109.    UConn's defamatory campaign to ruin the reputation of Professor Zane has also made her a pariah on the job market, preventing her from applying and securing gainful employment in her profession.

110.    UConn has taken these actions in bad faith to recoup the unpaid wages that UConn owes to Professor Zane.

111.    UConn is therefore liable to Professor Zane for twice the amount of the rightly earned wages she is owed in addition to her reasonable attorney fees and costs.

### COUNT II:
### INDIVIDUAL DEFENDANTS
### VIOLATION OF THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION

112.    Plaintiff incorporates all foregoing paragraphs into this paragraph as if fully restated here.

113.    Wages are property under the laws of the state of Connecticut.

114.    The Takings Clause of the Fifth Amendment to the United States Constitution provides, in relevant part, "No person shall… be deprived of . . .  property, without due process of law; nor shall private property be taken for public use, without just compensation."

115.    Under 42 USC § 1983, each citizen deprived of her civil rights, privileges, or immunities secured by the United States Constitution may bring suit at law or in equity to vindicate those rights, including the rights of Professor Zane under the Fifth Amendment to United States Constitution.

116.    Plaintiff Sherry Zane's duly earned wages have been withheld from her by Defendants Ofer Harel, Anne D'Alleva, and Radenka Maric, acting as state actors in their official capacity, and diverted into an unrestricted account for "research" as shown by Exhibit 1 to **Exhibit A**.

117.    By its actions, the University of Connecticut and Defendants have not only withheld Professor Zane's duly earned wages, forcing her to work twice over to secure her pay, they have now confiscated those wages and divested her of her property.

118.    Former Associate Dean Schlund Vials, who directly participated in setting up this account and executed the documents creating the account for the exclusive use of Professor Zane, attests under oath, "There was no question in my mind that this account held the compensation for Sherry Zane, which she had earned by teaching classes or other service to the University, but which the University could not pay to her directly." **Exhibit A**, ¶ 8. This account was set up for the exclusive use of Professor Zane and could not be used by other employees. Id., ¶ 14. "It was, in short, 'her money' which she [Plaintiff Professor Zane] had earned." Id.

119.    Defendant Ofer Harel is the Dean of the College of Liberal Arts and Sciences at the University of Connecticut and was directly responsible for presiding over the so-called "hearing" called by the University of Connecticut to divest, clawback, confiscate, and seize the duly earned wages of Plaintiff Sherry Zane. As such Defendant Harel acted under color of state law. Defendant Harel is a state actor.

120.    Defendant Anne D'Alleva was at all relevant times Provost and on information and belief Defendant Harel's direct supervisor and report. She had direct knowledge of and was directly responsible for the University of Connecticut's efforts to divest, clawback, confiscate, and seize the duly earned wages of Plaintiff Sherry Zane. As such Defendant D'Alleva acted under color of state law. Defendant Anne D'Alleva is a state actor.

121.    Defendant Radenka Maric was all relevant times President of the University of Connecticut and on information and belief Defendant D'Alleva's direct supervisor and report.  She had direct knowledge of and was directly responsible for the University of Connecticut's efforts to divest, clawback, confiscate, and seize the duly earned wages of Plaintiff Sherry Zane.  As such Defendant Maric acted under color of state law. Defendant Radenka Maric is a state actor.

122.    Defendants confiscated Plaintiff Professor Zane's wages without just compensation in direct violation of the Fifth Amendment to the United States Constitution.

123.    Defendants, in direct violation of the Fifth Amendment of the United States Constitution, confiscated Plaintiff Professor Zane's wages without due process of law, depriving her of the ability to know the identity of her accuser, to cross examine witnesses, to call witnesses and compel their testimony in order to build her defense, and imposed upon her the burden of proving her own innocence.

124.    Defendants as the state actors are therefore liable and must be ordered to disgorge all wages improperly withheld from Professor Zane and pay her reasonable attorney fees and costs. Defendants must be ordered to reinstate Professor Zane to the full privileges of her employment.

## COUNT III
## INDIVIDUAL DEFENDANTS
## VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

125.    Plaintiff incorporates all foregoing paragraphs into this paragraph as if fully restated here.

126.    Wages are property under the laws of the state of Connecticut.

127.    Section 1 of the Fourteenth Amendment to United States Constitution provides, in relevant part, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property,

without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

128.    The Fourteenth Amendment to the United States Constitution also applies the due process clause of the Fifth Amendment to the United States Constitution effective against the state of Connecticut is a state of the United States of America.

129.    Under 42 USC § 1983, each citizen deprived of her civil rights, privileges, or immunities secured by the United States Constitution may bring suit at law or in equity to vindicate those rights, including the rights of Professor Zane under the Fourteenth Amendment to United States Constitution.

130.    Defendant Ofer Harel is the Dean of the College of Liberal Arts and Sciences at the University of Connecticut and was directly responsible for presiding over the so-called "hearing" called by the University of Connecticut to divest, clawback, confiscate, and seize the duly earned wages of Plaintiff Sherry Zane. As such Defendant Harel acted under color of state law and is a state actor.

131.    Defendant Anne D'Alleva was at all relevant times Provost and on information and belief Defendant Harel's direct supervisor and report. She had direct knowledge of and was directly responsible for the University of Connecticut's efforts to divest, clawback, confiscate, and seize the duly earned wages of Plaintiff Sherry Zane. As such Defendant D'Alleva acted under color of state law and is a state actor.

132.    Defendant Radenka Maric was at all relevant times President of the University of Connecticut and on information and belief Defendant D'Alleva's direct supervisor and report. She had direct knowledge of and was directly responsible for the University of Connecticut's efforts to divest, clawback, confiscate, and seize the duly earned wages of Plaintiff Sherry Zane. As such Defendant Maric acted under color of state law and is a state actor.

133.    Defendants, in direct violation of the Fifth Amendment of the United States Constitution, confiscated Plaintiff Professor Zane's wages without due process of law, depriving her of the ability to know the identity of her accuser, to cross examine witnesses, to call witnesses and compel their testimony in order to build her defense, and imposed upon her the burden of proving her own innocence.

134.    Defendants as the state actors are therefore liable and must be ordered to disgorge all wages improperly withheld from Professor Zane and pay her reasonable attorney fees and costs. Defendants must be ordered to reinstate Professor Zane to the full privileges of her employment.

## COUNT IV
## DEFENDANT KIMBERLY HILL
## DEFAMATION PER SE

135.    Plaintiff incorporates all foregoing paragraphs into this paragraph as if fully restated here.

136.    Defendant Kimberly Hill is the Director of Compliance at the University of Connecticut.  In this capacity she undertook a pretextual "investigation" at the direction of Defendants Harel, D'Alleva, and Maric.

137.    In the course of the investigation, the purpose of which was to divest Plaintiff Professor Zane of her duly earned wages after forcing her to work twice for the same compensation she had already earned, Defendant Hill published numerous, intentional misrepresentations and false statements.

138.    Defendant Hill had direct knowledge that the University of Connecticut had set up a "research account" for Professor Zane as memorialized in Exhibit 1 to **Exhibit A**.

139.    Professor Zane entered into a contract with UConn that stated, "Agreement to Waive Compensation":

faculty may waive compensation and remit **funds to any unrestricted University account**, provided it meets the guidelines described in Section 5 of the Procedures for the Faculty Compensation Policy.  A faculty member who chooses to waive compensation for an assignment must complete this and submit it to HR before any work begins.

(Emph. added.)

140.    Professor Zane informed Kimberly Hill in the course of the so-called "investigation" designed to divest Professor Zane of her duly earned wages that she was entitled to this account and conducted research.

141.    Yet Kimberly Hill made the following intentionally false statement, among others, in her so-called "Report":

> Dr. Zane's appointment as an in-residence faculty member is predominantly for the purpose of teaching courses. University Compliance recognizes that while some in-residence faculty have a portion of their appointment reserved for research, Dr. Zane is not one of them.

This false statement was completely unsubstantiated and lacked any basis in fact.  In short, it is a blatant and intentional lie, and it is a statement made in bad faith.

142.    Defendants Kimberly Hill published these and other defamatory statements to, among others but not limited to, Defendants Maric, D'Alleva, and Harel as well as to Attorney Bannister.

143.    Not only did Professor Zane's work include a research component, but her primary responsibility was to direct the program of WGSS, of which Defendant Hill was repeatedly informed, and which contemporaneous documents prove beyond dispute.

144.    Documents from the University of Connecticut demonstrate that this account was set up for Professor Zane and held her already earned compensation.  See Exhibit 1 to **Exhibit A** and ¶¶ 10-11.

145.    Defendant Hill made additional intentionally false statements to defame and ruin the reputation of Plaintiff Professor Zane.  These include but are not limited to the following:

- Professor Zane used Photoshop to falsify receipts.

- Professor Zane took trips to Belfast solely for the purpose of getting married.

- Professor Zane did not engage in activities to set up a study abroad program in Northern Ireland on behalf of the University of Connecticut.

- Professor Zane submitted false receipts for meals where she used aliases, even though Professor Zane had informed Investigator Hill that she used aliases because of concerns to expose individuals who had been involved in the Troubles of Northern Ireland.

- Professor Zane failed to teach classes while on her research trips.

146.    Defendant Hill knew that all of Professor Zane's research trips had been approved prior to Professor Zane taking them, and her receipts were approved after the fact (including by Associate Dean Capshaw).

147.    Professor Zane suffered damages to her reputation and livelihood.

148.    UConn is currently in the process of terminating Professor Zane as a result of Defendants Hill's pretextual investigation and so-called Report.   UConn is in the process of confiscating Professor Zane's duly earned wages and compensation set aside in her "research" account.

149.    University of Connecticut and in particular Defendant Hill acting on the University of Connecticut's behalf caused intentionally false accusations to be supplied to Connecticut state law enforcement prior to any final outcome of the pretextual investigation.   This resulted in Professor Zane being arrested for "larceny."  The "larceny" consisted in claiming her own, already earned wages. In reality, UConn is stealing Professor Zane's money.

150.    The University of Connecticut issued a statement to the press, the Hartford Courant, further defaming Professor Zane based on the clearly erroneous and defamatory "Report" of Defendant Hill.

151.    Plaintiff Professor Zane now gets hate mail in which she is demeaned with expletives by complete strangers who sent anonymous letters to her home, because the University of Connecticut made sure to provide her home address in these various defamatory publications.

152.    Because Defendant Hill accused Professor Zane of theft and larceny, despite affirmative knowledge of evidence directly contrary to false statements set forth in her so-called "Report," Defendant Hill is liable for defamation per se.

153.    Defendant Hill is liable for the damages caused to Professor Zane's reputation in an amount to be determined at trial.

## PRAYER FOR RELIEF

Plaintiff Sherry Zane pays this Honorable Court for the following relief:

i.    Declare Defendant University of Connecticut liable for violating Conn. Gen. Stat. 31-71a, et seq. for failing to pay Plaintiff Sherry Zane's fairly earned wages;

ii.    Declare Defendant Kimberly Hill liable for defamation for intentional misrepresentations published about Plaintiff Sherry Zane;

iii.    Declare Defendants liable under 42 USC § 1983 for the seizure of Plaintiff's property in the form of wages without just compensation in violation of the takings clause of the Fifth Amendment to the United States Constitution;

iv.    Declare Defendants in liable under 42 USC § 1983 for confiscating her property in the form of duly earned wages without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

v.    Order injunctive relief by directing Defendant University of Connecticut to disgorge all improperly withheld wages of Plaintiff Sherry Zane;

vi.    Order injunctive relief in the form of reinstatement of Plaintiff Sherry Zane to her position with the University of Connecticut;

vii.    Order Defendant University of Connecticut to pay twice all wages earned and improperly withheld from Plaintiff Sherry Zane under Conn. Gen. Stat. § 31-72(1);

viii.    Order Defendant University of Connecticut to pay Plaintiff Sherry Zane's reasonable attorney fees and costs under Conn. Gen. Stat. § 31-72(1-2) and 42 USC § 1981(b);

ix.    Enjoin Defendant University of Connecticut from placing Professor Zane on leave and taking further action to illegally withhold Plaintiff Sherry Zane's fairly earned wages;

x.    Order Defendant Kimberly Hill to pay Plaintiff Sherry Zane all direct and indirect damages for defamation of her character in an amount to be determined at trial;

xi.    Order pre-and post-judgment interest to be paid to Plaintiff Sherry Zane; and

xii.    Order such other relief at law or equity that the Court finds just and proper.

Respectfully submitted,

Michael Thad Allen (435762)
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT  06320
(860) 772-4738
mallen@allenharrislaw.com

28

# EXHIBIT A

## Affidavit of Cathy Schlund Vials

1. My name is Cathy Schlund Vials. I am currently the Iris Howard Regents Professor of English Literature in the Department of English and the Center for Asian American Studies at the University of Texas at Austin. In 2018, I was the Associate Dean for Humanities, Diversity, Equity, and Inclusion in the College of Liberal Arts and Sciences (CLAS) at the University of Connecticut. In 2019, I was appointed to the position of University of Connecticut Board of Trustees Professor (in English and Asian/Asian American Studies). In 2018-2019, I served as Interim Director of the Women's Gender and Sexuality Studies (WGSS) Program; this appointment was concomitant with my position in the CLAS Dean's Office.

2. On August 2, 2018, I signed the document that is attached to this affidavit as **Exhibit A**, captioned "Agreement to Waive Compensation." **Exhibit A** is an accurate copy of this document.

3. While I was Associate Dean at the University of Connecticut, these kinds of agreements were used to address a problem for faculty who are not tenured, or whom we called at the time "Professional Track faculty." These faculty were had what was called "in-residence appointments."

4. In-residence appointments were often asked to teach extra courses, for example in the summer, which I understand generated revenue for the University system. I also know that in-residence appointments were not all the same. Some were for administrative functions, even though the majority were for teaching, and some were for both teaching and administrative service. But even in-residence teaching faculty went to conferences and conducted legitimate research in service to the University.

5. While I was an Associate Dean, Sherry Zane taught such classes and performed administrative services for the University. At the time the aforementioned agreement was signed, Sherry Zane served as the Associate Director for the WGSS Program. The concern that presaged that agreement involved an institutional rule wherein summer salary compensation was predicated on the term of one's appointment; if a faculty member's appointment did not encompass the extra month(s) connected to summer teaching, there was no consistent mechanism to ensure compensation. In response, the account established in **Exhibit A** was intended to ensure that Sherry Zane had direct access to those earned monies in a manner consistent with university policy and procedure (e.g., the use of such funds for research and pedagogical purposes). Though I initiated the process, the form (and the request to establish such funds) was approved by another entity that occupied a higher position in the workflow.

6. The problem was that over a certain overload threshold, the University could not compensate faculty for the wages they earned teaching such classes directly. The "Agreement to Waive Compensation" was a way to work around this impediment.

1

7. The professor's wages and compensation for such overloads was held aside for the specific use of the professor in question, in the case of **Exhibit A**, Sherry Zane. A stand-alone research account was created for their/her exclusive use.

8. There was no question in my mind that this account held the compensation for Sherry Zane, which she had earned by teaching classes or other service to the University, but which the University could not pay to her directly. This is a problem that was well known within the University administration, namely the problem of not being able to get paid for work completed.

9. At the time I was aware that Sherry Zane was working on a couple of different projects involving research. Any representation that Sherry Zane was not expected or evaluated on the basis of research productivity is inaccurate given that her appointment at the time included administrative duties and her subsequent promotion (to Associate Professor-in-Residence) included an assessment of her research productivity. When I was charged with overseeing the WGSS Program in an interim director capacity, Sherry Zane had published an article based on her dissertation; that dissertation was focused on the treatment of LGBT U.S. military personnel in the first two decades of the twentieth century. While it was my understanding that she would continue researching this project, the establishment of this research fund was not exclusive to that project. Rather, the fund was intended to simultaneously support current and incentivize future research endeavors. Since leaving the University of Connecticut, I have not been privy to Sherry Zane's current research agenda, and thus cannot speak to it with any specificity.

10. I have evaluated the following statement in a report submitted about Professor Zane:

> . . . Dr. Zane's appointment as an in-residence faculty member is predominantly for the purpose of teaching courses. University Compliance recognizes that while some in-residence faculty have a portion of their appointment reserved for research, Dr. Zane is not one of them. None of her appointment letters since 2015 include the expectation or allocation of time for research. Yet, 12 of the 19 trips occurred when classes were in session and Dr. Zane was assigned to teach one or more courses.

11. I know from my personal, direct experience, including from my experience setting up the account for Professor Zane memorialized in **Exhibit A**, that this statement is misleading and inaccurate in that it misrepresents Professor Zane as "not one of them," meaning faculty who conduct research. The absence of such a mention fails to account for the fact that full-time faculty (inclusive of in-residence faculty) are able to apply for AAUP Professional Development Funds, which encompass "any academic-related travel expenses."

12. While I was not at the University after 2020, I do know that there was a preapproval process for all travel or projects in which one drew from the reserve funds set up under **Exhibit A**. The current policy involving travel reflects my understanding of the process when the research funds for Sherry Zane were established. Those seeking reimbursement

from a research account for academic travel were required to fill out a pre-approval travel form; as per established workflow, the travel request would be subject to approval by designated supervisors, the Fiscal Officer charged with overseeing the specific account, and the Accounts Payable Office. This workflow is meant to ensure compliance with university policy and protocol at multiple levels. Illustratively, while serving as Associate Dean, there were three instances that I did not approve the pre-approval request due to instances of noncompliance.

13. Based on my direct experience at the University of Connecticut, I know of no expectation or requirement that faculty report to the Dean's office "personal days" while they were on research trips.

14. The account set up for Professor Zane, like similar accounts set up for other in-residence appointments, was reserved for her individual use and could not be used by other employees. It was, in short, "her money" which she had earned. She could use it for research, travel, books, materials related to teaching, and any number of other purposes so long as this was pre- and post-approved.

15. I understand that Professor Zane has been arrested and is now facing a hearing for the misappropriation of university funds, based on her use of this account which I originally set up and into which her own earnings were deposited.

16. Given the seriousness of what has transpired, I am admittedly surprised that I was never contacted, given that I set up this account for Sherry Zane, and that I could have provided this information to any investigator. An investigation of alleged use or misuse of such funds that bypassed my direct knowledge of setting up this account is, based on my experience as a university administrator and university professor, imbalanced, incomplete, and inaccurate.

SIGNED UNDER THE PENALTIES OF PERJURY THIS _20_ DAY OF FEBRUARY 2025

_Cathy Schlund Vials_

Cathy Schlund Vials

The above named witness appeared before me and signed the foregoing document under oath,

_____

_____, Notary Public

My commission expires: 10 - 05 - 2026

JOSEPH DEPAZ SOBERANES
My Notary ID # 133999752
Expires October 5, 2026

State of Texas
County of Travis

This Instrument was acknowledged before me on 02-20-2025

By _Cathy J Schlund-Vials_

NOTARY _Joseph Soberanes_

3

# EXHIBIT 1

## Agreement to Waive Compensation

*This form should be completed by University faculty who wish to decline extra compensation for additional assignments (typically research or teaching performed during the summer) and instead intend that payment be remitted to a University account.*

**Background**: The act of waiving compensation and directing funds to a University account implicates tax rules that, if not properly observed, can result in the compensation being taxable to the employee, even though the employee did not receive it. This form is intended to prevent that situation.

**Instructions**: A faculty member who chooses to decline extra compensation for additional assignments must complete this form and submit it to HR <u>before</u> any work begins.

In general, funds may be remitted to any unrestricted University account, provided that the faculty member <u>does not have unrestricted control over</u> that account. The following guidelines must be observed:

1. Neither the faculty member, nor any employee reporting to him or her may serve as the Fiscal Officer on the account unless measures exist that require the approval of a third party, such as the faculty member's supervisor;
2. There must not be any arrangement or agreement that permits the faculty member to be the sole decision maker regarding the use or expenditure of the funds from the account; and
3. The account must be subject to all University policies regarding oversight and appropriate use of University funds.

Consistent with the University's mission, the account can be used for a wide variety of purposes, including, but not limited to: teaching and research supplies or equipment, scholarly travel, and related expenses. The account <u>may not</u>, however, be used to pay or supplement the employee's salary. Related questions or concerns can be directed to Human Resources at 486-3034.

---

**PART I**: *To be completed by the **faculty member**.*

I waive my right to compensation for the following services:

| | |
|---|---|
| Description of Services: | Summer online course |
| Date of Services: | 07/09/2018 – 08/13/2018 |
| Amount: | $9336.00 |
| SPAR # (if available): | 1900393 |

Instead of accepting my compensation, I request (but do not direct) that an equivalent payment be made to the following University account, which conforms to the standards described above:

| | |
|---|---|
| KFS account: | 4637680 |

I understand that I may not change or revoke this agreement.

| Signature: *Suey Zone* | Date: 08/02/18 |
|---|---|
| Printed Name: | |

**PART II**: *To be completed by the faculty member's **Dean, Director, or Designee.***

This University employee has my approval to perform the services, and any associated funds will be administered according to the standards described above.

| Signature: *Cathy J Schlund Vials* | Date: 8/02/2018 |
|---|---|
| Printed Name: Cathy Schlund Vials | |

| For Human Resources Use Only: ___ Completed | |
|---|---|
| HR Signature: | Date: |

# Exhibit B

AFFIRMATION OF FRANÇOISE DUSSART

1. My name is Françoise Dussart.  I am a resident of New York City, New York and am over the age of 18.

2. I am currently Professor of anthropology In the Department of Anthropology, College of Liberal Arts and Sciences and an affiliate Professor in the Department of Women's, Gender, and Sexuality Studies at the University of Connecticut.  As such, I am familiar with the research agenda of Professor Sherry Zane.

3. I have known Sherry Zane both personally and professionally for over ten years, since she was a graduate student in the department of History.

4. I am aware of the current allegations against Sherry Zane that accuse her of Misuse of Resources; Women's, Gender, and Sexuality Studies (WGSS) and I am aware that she has been charged with larceny. I have read the UCONN compliance report authored by Kimberly Hill dated November 14, 2024,  that details the accusations, and I have read Sherry Zane's response to the same.

5. I find these allegations to be misleading. Sherry Zane has done nothing wrong and for her to be charged with a crime is unfathomable.

6. I have collaborated with Sherry Zane often shared academic interests and pursuits.  We discuss research often.

7. In 2015, I traveled to Belfast and saw political murals from prior "turf wars".  They were fascinating.  I introduced Sherry Zane to the existence of these murals when we were discussing our interests in gender, war, and art, and how these murals could be a wonderful research opportunity.

8. It is not uncommon for academic colleagues to provide each other with different ideas and topics to research.

9. It is my strong belief that Sherry Zane's trips to Belfast were undoubtedly tied to her professional and academic research of the murals and how the community viewed and reacted to them. We have discussed this topic of research many times and Sherry is very knowledgeable on the subject.

10. Sherry worked tirelessly on this research, never shirking on her other professional responsibilities related to her employment at UCONN. Sherry gave 500% of herself to UCONN, between her research, WGSS, her courses, and administrative duties. She is a multi-tasker, with a full, diverse schedule. Despite her many responsibilities, Sherry is attentive and present to anything that requires her focus.

11. Although Sherry never referred to Jim Potts as a romantic partner in her conversations with me, she did mention him as a person in Belfast who had many connections and was able to make introductions for Sherry to individuals who could contribute to her research while in Belfast.

12. I know of no rules or policies at the University of Connecticut which prohibit faculty from entering into personal relationships, romantic or otherwise, with individuals in the course of their other professional duties on research trips. If there are such rules that are unknown to me,

13. I learned later that Sherry and Jim had married, and that, in "typical Sherry" behavior, she squeezed in a very brief civil ceremony between other meetings regarding her research. When you are as passionate as Sherry is about her field of study and research, you have no trouble making your research your highest priority.

14. I know of no rules or policies of the University of Connecticut that authorize the office of University Compliance to pass judgment on the value or quality or methods of a faculty member's research. In my direct experience, it is always the faculty that is qualified to judge the quality and methods of a fellow faculty member's research.

15. I do know that Sherry Zane taught her courses remotely and integrated her research into her classes.

16. Although I am a member of the Women's, Gender, and Sexuality Studies at the University of Connecticut, I was never contacted or interviewed in connection with any investigation of Sherry Zane.

17. I hold Sherry Zane in the highest regard, both personally and professionally, and I find it abhorrent what is being done to her.

I affirm this _3_ day of _March, 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____

Françoise Dussart

# EXHIBIT C

## AFFIRMATION OF LAURA MAULDIN

1. My name is Laura Mauldin. I am a resident of New York City, New York and am over the age of 18.

2. I am currently an Associate Professor of Women's, Gender, and Sexuality Studies in the Department of Social and Critical Inquiry at the University of Connecticut. As such, I am familiar with the research agenda of Professor Sherry Zane.

3. I have known Sherry Zane both personally and professionally for over ten years. We were colleagues.

4. I am aware of the current allegations against Sherry Zane that accuse her of misuse of resources; and I am aware that she has been charged with larceny. I have read the UCONN report authored by Kimberly Hill dated November 14, 2024, that details the accusations, and I have read Sherry Zane's response to the same.

5. I have collaborated with Sherry Zane often concerning shared academic interests and pursuits. We discuss research often, particularly in relation to making personal connections with individuals and developing rapport.

6. As an experienced scholar and someone familiar with the kind of research that Sherry Zane does, I can say based on my professional experience that Sherry Zane's trips to Belfast and Disney were undoubtedly tied to her professional and academic research and would be recognized as such by any reasonable scholar in her field.

7. In addition, given Sherry Zane's research and methods, it would be very appropriate for Sherry to have her children with her at Disney as their presence would serve as a natural conduit for Sherry to connect with other families at Disney and in the Orlando community.

8. Similarly, it would be appropriate for Sherry to build personal connections in Belfast with community members and using those connections to strengthen her research.

9. I know of no rules or policies of the University of Connecticut that authorize the office of University Compliance to pass judgment on the value or quality or methods of a faculty member's research. In my direct experience, it is always the faculty that is qualified to judge the quality and methods of a fellow faculty member's research.

10. Although I am a member of the Women's, Gender, and Sexuality Studies at the University of Connecticut, I was never contacted or interviewed in connection with any investigation of Sherry Zane.

I affirm this 28th day of February, 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

_____
Laura Mauldin

# EXHIBIT D

October 28, 2024

To Whom it May Concern,

I met Sherry Zane February, July and November of 2023 in my capacity as Financial Director of the Ullans Academy, where we discussed her research here in Belfast. She talked about the impact of street art on public memory and how she wanted to build a study abroad program to bring students from the University of Connecticut to Belfast to explore women's roles in the Troubles and their impact on peacebuilding. I told her to let me know if there was any way I could help to support her endeavors here.

Signed,

Peter Lismore
Ullans Academy

# EXHIBIT E



## Request for Human Subjects Research Determination

| Project Title: *Insurgent Murals: Women's Art Activism in Buenos Aires, Khartoum, and Belfast* | **Date:** *4.21.22* |
|---|---|

### I.  Applicant Information

| **Name:** *Sherry Zane* | |
|---|---|
| ☒ Faculty ☐ Student ☐ Other: | Dept./Unit: *Women's, Gender & Sexuality Studies* |
| Address: *11 Rham Road* | |
| Email: *sherry.zane@uconn.edu* | Phone: *860-917-7292* |

**Faculty Advisor** *(if appropriate)* ☒ N/A

**NOTE***: A Faculty Advisor is required if the applicant is a student, resident or fellow.*

| Name: | Department/Unit: |
|---|---|
| Address: | |
| Email: | Phone Number: |

### II.  PROJECT DESCRIPTION

**Summary.**  Provide a summary of the proposed project.  The summary should summarize the subjects involved, the objectives of this project and the procedures to be used.  Alternatively, a narrative or protocol may be attached and submitted.

We are conducting this study as part of a comparative study for Bhakti Shringarpure, Elva Orozco Mendoza, and Sherry Zane's work in the Women's, Gender and Sexuality Studies Program that involves oral histories of the impact of insurgent art on post-conflict communities.  This study looks at public mural art and its impact on communities in Belfast, Northern Ireland, Buenos Aires, Argentina, and Sudan, Khartoum.

Though Argentina, Sudan and Northern Ireland have their own particular and complex histories, they also share experiences of fighting colonialism and deliberate erasures of women's histories. As such, they constitute geographic sites of resistance within the longue durée of violence. To integrate these three interlinked protest histories and gendered geographies, we coin the concept of "insurgent murals" that we define as large graphic art which begins to populate walls, doors, or any available vertical spaces in public areas during and after uprisings have erupted. The insurgent interventions enacted by these murals appear in direct defiance of state-backed, and often violent, authority which targets women and other subaltern subjects. Specifically, we explore the significance of these insurgent murals as they:

· Memorialize those who, in devoting their lives to the revolution, have come to embody immense symbolic significance for the ongoing struggle.

· Ensure that women's demands for freedom, democracy, rights, and justice remain a core concern.

· Keep channels of communication alive among protesters especially when authorities shut down phone, internet, and other communication systems.

· Signal solidarity with other protest movements happening within and across the national borders.

· Foster the practice of cultural citizenship and political subjectivity.

Sherry Zane will conduct interviews in Northern Ireland with community members and artists.

I will examine the images, colors, motifs, inscriptions if available, techniques, and location among other things. If mural artists agree to take part in this study, I will interview them regarding their creative process. If community members agree to take part in this study, they will be interviewed and will be asked questions about how the murals represent social and political struggles that stem from "The Troubles", 1968-1998.  The interviews are specific to their individual opinions about mural art and its impact on their histories.

If they consent to videotaping of the interview, then this interview would be videotaped.  Whether interviews are videotaped or not, all interviews will be audiotaped with the goal of transcribing part or all of the interview at a later time.

Interviews will be conducted at a location that is convenient for the participant, either in their home or in a public building or school, or outside.  Interviews will take place in July-August 2022.  Interviews typically take anywhere from 30 minutes to an hour or two at the most.  If they do not have time for a longer interview, the interview can end whenever they need them to end.

Most people interviewed for this project will not be contacted again, but there may be follow-up questions for some so it is possible that they might be asked if they would be willing to be interviewed a second time.  They could be invited to review part or all of an interview transcript from their interview.  Or they could be contacted by email and be asked if they would be willing to answer follow-up questions.  If they prefer not to be contacted again, they will not be contacted again.

There are no costs, and they will not be paid to be in this study.  If they are interviewed at a location other than their home, they would be responsible for the travel costs to that location such gas money, bus fare and/or parking fees.

The data from this study may be published in scholarly or popular journals, online, in newspapers or in a book.  The data may be presented by Sherry Zane, Bhakti Shringarpure, and Elva Orozco Mendoza during classes taught in the U.S. or elsewhere or at academic conferences.   Transcripts and audio/video tapes of these interviews may be provided in hard copy and/or digital form in a digital archive for the Women's, Gender and Sexuality Studies Program at the University of Connecticut.

Interviewees may request the destruction of their interview for any reason at any time until six months after the interview.  If they request that their interview be destroyed within that six-month period, all records, videos, tapes and any other materials pertaining to their interview will be destroyed.  To ensure this option, no records pertaining to their interview will be deposited in archives until at least six months from the time of their interview.

They will choose whether their participation is CONFIDENTIAL (in which case their identity will not be revealed) or NON-CONFIDENTIAL (in which case their identity will be revealed in study results) by selecting a box below.

If they choose for their participation to be CONFIDENTIAL, their name will not be included in any interview transcript, and they can choose whether or not they would like to have an audio or video recording preserved from the interview.  If they choose to do a video, any video recording of the interview will be in silhouette with my face in shadow.  If they choose not to have a video, then only an audio recording would be made which could either be preserved without their name included on the audio tape or the audio tape could be destroyed after the transcript is typed from the tape.  The transcript that is produced would not include their name.

If they choose that their participation is non-confidential, then the records for their interview, including the audio/video tapes and any transcripts will be preserved indefinitely in historical archives that will be accessible by the public either in person and/or online.  If they choose for their participation to be confidential, the tapes of their interview will be heard by the people who transcribe the interview which would include, Sherry Zane, a volunteer intern for Sherry Zane, or a transcription company hired by Sherry Zane that would be informed by Sherry Zane that all recordings in their possession should be deleted or destroyed after the transcription is completed.

Interviewees will be asked to choose A or B:
Please choose either A or B.  If you choose B, please check which additional box you prefer.

A)  [  ] I choose for my participation to be NON-CONFIDENTIAL (my identity will be revealed in study results).

B)  [  ] I choose for my participation to be CONFIDENTIAL (my identity will not be revealed).

     If I am choosing my participation to be CONFIDENTIAL.  I understand that there are three ways to have my interview be confidential:

          [  ] Most Confidential:  No Video or Audio preserved.  An audio recording would be made during the interview, but it would then be destroyed after the transcript is completed.   The transcript would not have my name in it.

          [  ] Next Most Confidential:  Audio tape and transcript preserved without my name mentioned;

          [  ] Transcript, Audio tape, and Video tape preserved without my name mentioned.  The video would be in silhouette form with my face in shadow.

**Interviewees will be informed of the following:**
We will do our best to protect the confidentiality of the information we gather from the interviewees, but we cannot guarantee 100% confidentiality. Their confidentiality will be

maintained to the degree permitted by the technology used. Specifically, no guarantees can be made regarding the interception of data sent via the Internet by any third parties.

They should also know that the UConn Institutional Review Board (IRB) and Research Compliance Services may inspect study records as part of its auditing program, but these reviews will only focus on the researchers and not on your responses or involvement. The IRB is a group of people who review research studies to protect the rights and welfare of research participants.

### III.   QUALITY IMPROVEMENT, PROGRAM EVALUATION ASSESSMENT

QI and research, and Program Evaluation and research, are not mutually exclusive terms, sometimes an activity can be both. The questions in this section help differentiate whether an activity is purely QI or Program Evaluation, or if the activity includes a research component. Complete this section if you believe your activity is Quality Improvement or Program Evaluation; otherwise, skip the questions in this section and move forward to **Section IV**.

**Quality Improvement (QI)** - involves systematic activities that are designed and implemented by an organization to monitor, assess, and improve the quality of its services, processes, or programs.

**Program Evaluation** – individual systematic activities conducted to assess how well a program is working and why.

1. The methods used in an activity can help distinguish whether a project is QI, program evaluation, or research. Please answer the following:

   a. Does the project involve randomization, blinding, or assignment into two or more subject groups or arms?

      ☐ **Yes.** These methods are more consistent with research than quality or program evaluation

      ☒ **No**

   b. Does the activity use Quality Improvement methods such as FADE, PDSA, Six Sigma, CQI, or TQM?

      ☐ **Yes.** These methods are more consistent with quality improvement than research

      ☒ **No**

2. Similarly, the intent of the activity is informative to the determination.

   a. Evaluate or improve clinical care or a process, practice, or program at UConn-Storrs?

      ☐ **Yes** ☒ **No**

   b. Only be applied to populations, or inform practice within the target population or UConn-Storrs?

      ☐ **Yes** ☒ **No**

   c. Implement an evidence-based practice, process, or program and evaluate whether it functions as intended within the UConn-Storrs or with the local target population?

      ☐ **Yes** ☒ **No**

   d. Evaluate an existing practice, process, or program to determine if it is functioning as intended?

      ☐ **Yes** ☒ **No**

    **e.**  Establish scientific evidence, or build upon early existing evidence, in support of a new or modified practice, process, or program?

        ☐ **Yes** ☒ **No**

**3.**  Based upon the scientific literature, is it expected that all participants will benefit from the practice, process, or program or is this unknown?

    ☐ **Yes** ☐ **No**        ☒ **Unknown**        ☐ **N/A to this proposal**

**4.**  Are there any risks to participants anticipated as a result of inclusion in the program or initiative?

    ☐ **Yes** ☒ **No**

    If Yes:

    **a.**  Does this represent an overall increase or decrease in risk exposure?

    **b.**  What steps are being taken to minimize those risks?

**5.**  Please use this space to explain if you were unable to answer any of the above questions or provide additional information that may be relevant to the determination:

**Once you've completed the questions in this section, move forward to Section IV.**

**IV.   COMMON RULE DETERMINATION**

**1.**  The Common Rule lists specific activities deemed not to be research.

| | Yes | No |
|---|---|---|
| **Is the project limited to any of the following activities?** | ☒ | ☐ |
| ☒ **Scholarly and journalistic activities** (e.g., oral history, journalism, biography, literary criticism, legal research, and historical scholarship), including the collection and use of information, **that focus directly on the specific individuals about whom the information is collected**. | | |
| ☐ **Public health surveillance activities**, including the collection and testing of information or biospecimens, **conducted, supported, requested, ordered, required, or authorized by a public health authority**. Such activities are limited to those necessary to allow a public health authority to identify, monitor, assess, or investigate potential public health signals, onsets of disease outbreaks, or conditions of public health importance (including trends, signals, risk factors, patterns in diseases, or increases in injuries from using consumer products). Such activities include those associated with providing timely situational awareness and priority setting during the course of an event or crisis that threatens public health (including natural or man-made disasters). | | |
| ☐ Collection and analysis of information, biospecimens, or records by or for a **criminal justice agency for activities authorized by law or court order solely** for criminal justice or criminal investigative purposes. | | |
| ☐ **Authorized operational activities (as determined by each agency)** in support of intelligence, homeland security, defense, or other national security missions. | | |

> **If Yes,** the proposed activity is not human subjects research according to the Common Rule. Proceed to Section V to evaluate whether the proposed activity is research subject to FDA regulations.
>
> **If No, proceed to question 2 below.**

2. Is the activity **"research"**?

   As defined by Department of Health and Human Services (DHHS) regulations: *"Research means a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge."* 45 CFR 46.102(l)

   a. Does the activity involve a **systematic investigation** *(i.e., an activity that involves a prospective plan which incorporates data collection, either quantitative or qualitative, and data analysis to answer a question)*?

      ☐ **Yes** ☐ **No**

   b. Is the activity is designed to develop <u>or</u> contribute to **generalizable knowledge** *(i.e., the evidence base for the process, practice, or program is not yet firmly established or accepted; and, the activity is not dependent on the unique characteristics of the target population or system in which it will be implemented)*?

      ☐ **Yes** ☐ **No**

3. Does the activity involve **"human subjects"**?

   a. Will you be gathering information or biospecimens **about** living individuals?

      ☐ **Yes** ☐ **No**

   b. Will you obtain information or biospecimens through **intervention** with living individuals, and use, study, or analyze the information or biospecimens? This *includes both physical procedures by which information or biospecimens are gathered (for example, venipuncture) and manipulations of the subject or the subject's environment that are performed for research purposes.*

      ☐ **Yes** ☐ **No**

   c. Will you obtain information or biospecimens through **interaction** with living individuals and use, study, or analyze the information or biospecimens? *This includes communication or interpersonal contact between researchers and subjects, including indirect interaction such as via a web-based survey.*

      ☐ **Yes** ☐ **No**

   d. Will you obtain, use, study, analyze, or generate **identifiable private information** or **identifiable biospecimens**?

      ***Private Information*** *includes information about behavior that occurs in a context in which an individual can reasonably expect that no observation or recording is taking place, and information that has been provided for specific purposes by an individual and that the individual can reasonably expect will not be made public (for example, a medical or education record).*

      ***Identifiable private information*** *is private information for which the identity of the subject is or may readily be ascertained by the investigator or associated with the information.*

      ***An identifiable biospecimen*** *is a biospecimen for which the identity of the subject is or may readily be ascertained by the investigator or associated with the biospecimen.*

*Note: When data or specimens are coded, and the investigator has access to the key or another means to re-identify, the data is identifiable.  Consult with the IRB Office for questions on this topic.*

☐ **Yes** ☐ **No**

4. Based on the above, is it your opinion that the activity includes "**human subjects research**" as defined by the Common Rule ("Yes" to 2(a) <u>and</u> (b) and "Yes" to 3(a) <u>and</u> (b), (c) <u>or</u> (d))?

☐ **Yes.**  The proposed activity is or includes human subjects research.  Do not submit this form, an application for an exempt determination or IRB review is required.  Please contact the IRB office with any questions.

☐ **No.**  The proposed activity is not human subjects research according to the Common Rule.  Proceed to Section V to evaluate whether the proposed activity is research subject to FDA regulations.

**V.  FDA DETERMINATION**

*Note: If an approved drug or device is being used on-label for the purposes of collecting data (e.g., fMRI) or to establish a physiological state (e.g., drowsiness after administration of a single dose of Benedryl®) then FDA does not consider the use to be research.*

1. Does the activity include the clinical investigation of an **FDA-regulated test article**?

a. Does the activity include the clinical investigation of a **<u>DRUG</u> or <u>BIOLOGIC</u>** regulated as a drug? *(A clinical investigation means any experiment in which a drug is administered or dispensed to, or used involving, one or more human subject.  For the purposes of this part [21 CFR 312], an experiment is any use of a drug except for the use of a marketed drug in the course of medical practice. (21 CFR 312.3(b))*

☐ **Yes** ☒ **No**

b. Does the activity include the investigation of a **<u>MEDICAL DEVICE</u> or <u>BIOLOGIC</u>** regulated as a medical device? *(A clinical investigation or research involving one or more subjects to determine the safety or effectiveness of a device. (21 CFR 812.3(h))*

☐ **Yes** ☒ **No\***

**\***Complete Appendix A if you believe that the device under investigation is **medical and decision support software** that has been excluded from FDA's definition of medical device under the 21ˢᵗ Century Cures Act.

c. Does the activity include the clinical investigation of an **<u>HCT/P</u>** (human cells, tissues, or cellular or tissue-based product) regulated as a drug, biologic, and/or medical device?

☐ **Yes** ☒ **No**

d. Does the activity evaluate a human food additive, nutritional supplement, color additive, radiation-emitting electronic product, or other article subject to <u>FDA regulation</u>?

☐ **Yes** ☒ **No**

e. Will/may the results of the activity be submitted to or held for inspection by FDA as part of an application for a research or marketing permit?

☐ **Yes** ☒ **No**

2.  Does the activity involve **Human Subjects** as defined by the FDA?

    ***Human subject*** *means an individual who is or becomes a participant in research, either as a recipient of the test article or as a control. A subject may be either a healthy individual or a patient. In the case of a medical device, a human subject also includes any individual on whose tissue specimen an investigational device is used or tested. [Note: This definition does not require that specimens or data are identifiable.]*

    ☐ **Yes**  ☒ **No**

3.  Based on the above, is it your opinion that the activity includes "**human subjects research**" subject to FDA regulations ("Yes" to any item in 1(a-e) or 2 and "Yes" to 3)?

    ☐ **Yes.**  The proposed activity involves human subjects research subject to FDA regulations.  IRB approval is required.

    ☒ **No.**  The proposed activity does not involve human subjects research subject to FDA regulations.  Submit this form to the IRB office if you are seeking an official determination and documentation that exemption or IRB approval is not required.

## VI.    ADDITIONAL INFORMATION

1.  Describe any plans for the use and/or dissemination of results internally and/or externally:

    The data from this study may be published in scholarly or popular journals, online, in newspapers or in a book.  The data may be presented by Sherry Zane, Bhakti Shringarpure, and Elva Orozco Mendoza during classes taught in the U.S. or elsewhere or at academic conferences.  Transcripts and audio/video tapes of these interviews may be provided in hard copy and/or digital form in a digital archive for the Women's, Gender and Sexuality Studies Program at the University of Connecticut.

2.  Provide any additional information that you believe may be relevant for this determination:

## VII.    SIGNATURE

I will conduct the activities identified above in the manner described on the attached narrative.  If I decide to make any changes, I will submit the proposed changes to the UConn-Storrs Institutional Review Board, for confirmation that the activity remains "not human subjects research".

___Sherry Zane_____          4.21.22_____
Investigator Signature                                          Date


**IF THE INVESTIGATOR IS A STUDENT, A FACULTY ADVISOR  MUST SIGN BELOW:**  I have read this application and approve of this project.

_____
Faculty Advisor Signature                                    Date

**Appendix A: Medical and Decision Support Software Excluded from the Definition of Medical Device**

**A. Software Function Intended for Administrative Support of a Health Care Facility**

**Regulatory Language:**

The term device…shall not include a software function that is intended…for administrative support of a health care facility, including the processing and maintenance of financial records, claims or billing information, appointment schedules, business analytics, information about patient populations, admissions, practice and inventory management, analysis of historical claims data to predict future utilization or cost-effectiveness, determination of health benefit eligibility, population health management, and laboratory workflow.

**Guidance:**

- Changes to Existing Medical Software Policies Resulting from Section 3060 of the 21st Century Cures Act

If applicable, provide justification for why this exclusion from the FDA definition of medical device applies to your proposed activity:

**B. Software Function Intended for Maintaining or Encouraging a Healthy Lifestyle**

**Regulatory Language:**

The term device…shall not include a software function that is intended…for maintaining or encouraging a healthy lifestyle and is unrelated to the diagnosis, cure, mitigation, prevention, or treatment of a disease or condition.

**Guidance:**

- Changes to Existing Medical Software Policies Resulting from Section 3060 of the 21st Century Cures Act
- General Wellness: Policy for Low Risk Devices
- Mobile Medical Applications

If applicable, provide justification for why this exclusion from the FDA definition of medical device applies to your proposed activity:

**C. Software Function Intended to Serve as Electronic Patient Records**

**Regulatory Language:**

The term device…shall not include a software function that is intended…to serve as electronic patient records, including patient-provided information, to the extent that such records are intended to transfer, store, convert formats, or display the equivalent of a paper medical chart, so long as—
  (i) such records were created, stored, transferred, or reviewed by health care professionals (HCPs), or by individuals working under supervision of such professionals;
  (ii) such records are part of health information technology that is certified under a program of voluntary certification kept or recognized by the Office of the National Coordinator for Health Information Technology (ONC) under section 3001(c)(5) of the Public Health Service Act ("ONC Health IT Certification Program"); and
  (iii) such [software] function is not intended to interpret or analyze patient records, including medical image data, for the purpose of the diagnosis, cure, mitigation, prevention, or treatment of a disease or condition

**Guidance:**

- Changes to Existing Medical Software Policies Resulting from Section 3060 of the 21st Century Cures Act
- Mobile Medical Applications

If applicable, provide justification for why this exclusion from the FDA definition of medical device applies to your proposed activity:

**D. Software Function Intended for Transferring, Storing, Converting Formats, Displaying Data and Results**

**Regulatory Language:**

The term device...shall not include a software function that is intended...for transferring, storing, converting formats, or displaying clinical laboratory test or other device data and results, findings by a health care professional with respect to such data and results, general information about such findings, and general background information about such laboratory test or other device, unless such function is intended to interpret or analyze clinical laboratory test or other device data, results, and findings

**Guidance:**

- Changes to Existing Medical Software Policies Resulting from Section 3060 of the 21st Century Cures Act
- Medical Device Data Systems, Medical Image Storage Devices, and Medical Image Communications Devices
- Mobile Medical Applications

If applicable, provide justification for why this exclusion from the FDA definition of medical device applies to your proposed activity:

**E. Software Function Intended to Provide Decision Support for the Diagnosis, Treatment Prevention, Cure, or Mitigation of Disease or Other Conditions**

**Regulatory Language:**

The term device...shall not include a software function that is:
   (i) Not intended to acquire, process, or analyze a medical image or a signal from an in vitro diagnostic device or a pattern or signal from a signal acquisition system;
   (ii) [Is] intended for the purpose of displaying, analyzing, or printing medical information about a patient or other medical information (such as peer-reviewed clinical studies and clinical practice guidelines);
   (iii) [Is] intended for the purpose of supporting or providing recommendations to a health care professional about prevention, diagnosis, or treatment of a disease or condition; and
   (iv) [Is] intended for the purpose of enabling such health care professional to independently review the basis for such recommendations that such software presents so that it is not the intent that such health care professional rely primarily on any of such recommendations to make a clinical diagnosis or treatment decision regarding an individual patient.

**Guidance:**
- Clinical and Patient Decision Support Software

If applicable, provide justification for why this exclusion from the FDA definition of medical device applies to your proposed activity:

**Additional FDA Guidance with Digital Health content is available on this website:**
https://www.fda.gov/MedicalDevices/DigitalHealth/ucm562577.htm

**HRPP/IRB USE ONLY**

1. **Reviewer Conflict of Interest**
   Do you have any interests, financial or otherwise, related to this submission that could present a conflict of interest?

   ☐ Yes.  Please do not conduct this review, contact the IRB office so that this submission can be reassigned.
   ☐ No

2. **Determination**
   ☐ The activity **does not** involve human subjects.
   ☐ The activity **is not** research.
   ☐ The activity involves the evaluation of a product **excluded from the FDA definition of medical device**.  The activity:  ☐ is   ☐ is not   human subjects research per the Common Rule.
   ☐ The activity **does** involve human subjects research per the:  ☐ Common Rule   ☐ FDA
      An application to the IRB is required.
   ☐ Additional information is needed (see "Changes, Modifications, and Clarifications" below)

**Reviewer Notes:**

**Changes, Modifications, and Clarifications**

| | |
|---|---|
| | |
| Reviewer Name: | Date: |

# EXHIBIT F

Oh Sherry! What a fucking piece of shit You are. Disgusting Thief! How could You go and steal all that money from your job, $58,000 plus?! You are Pathetic and spend it all on yourself and family to go Disney, plus other vacations and Lord knows where else You spent peoples hard earned money. Every neighbor, Everybody is pointing their finger at you, you piece of <u>Trash</u>. What a fucking embarrasment you are to your family and friends!!! WTF did you do that for? Fucking THEIF! Criminal!!! Bitch you need to stay in prison for Years. I pray you get at least 10 Years Bitch! Everyone hates you! Your nasty! People work hard and you go and steal it. Nasty fuck! Everybody laughing at you in public! all eyes are on you bitch!